**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN OVERSIGHT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| THE TREASURY, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| COMMITTEE ON WAYS AND MEANS | ) |
| OF THE UNITED STATES | ) |
| HOUSE OF REPRESENTATIVES | ) |
| | ) |
| Intervenor-Defendant. | ) |
| | ) |

Civil Action No. 17-2078 (RBW)

## <u>MEMORANDUM OPINION</u>

The plaintiff, American Oversight, brings this civil action against the defendant, the

United States Department of the Treasury ("Treasury"), and the intervenor-defendant, the

Committee on Ways and Means of the United States House of Representatives (the

"Committee"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2018),

and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (2018).  See Complaint ("Compl.")

at 1; Min. Order (June 22, 2018).  Currently pending before the Court are (1) the Defendant's

Motion for Summary Judgment ("Def.'s Mot.") and (2) and the Plaintiff's Cross-Motion for

Summary Judgment ("Pl.'s Mot.").  Upon careful consideration of the parties' submissions,[1] the

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the defendant's Answer ("Answer"); (2) the Memorandum in Support of Defendant[']s[] Motion for Summary Judgment ("Def.'s Mem."); (3) the Declaration of Daniel J. Kowalski ("Kowalski Decl."); (4) the

(continued . . .)

Court concludes for the following reasons that it must grant Treasury's motion for summary

judgment and deny the plaintiff's cross-motion for summary judgment.

## I.   BACKGROUND

According to Treasury,

> [b]eginning in April 2017, Treasury officials and staff provided technical and other support to the "Big Six," which was comprised of Treasury Secretary Steven Mnuchin, National Economic Council Director Gary Cohn, Senator Majority Leader Mitch McConnell, Senate Finance Committee Chair Orrin Hatch, Speaker of the House Paul Ryan, and House Ways and Means Committee Chairman Kevin Brady.  The mandate of the Big Six was to develop a unified framework to achieve pro-growth, fiscally-responsible tax reform.   To help facilitate the work of the Big Six, a group of officials from the White House, Treasury, and key Republican Senate and House staffers convened what was informally known a[s] the "Tax Reform Working Group," on which . . . Treasury officials represented Secretary Mnuchin's interests.  The Tax Reform Working Group regularly met during the period of April [to] November 2017, and shared information related to efforts by the parties to draft and ultimately enact legislation to reform the tax code.

Kowalski Decl. ¶¶ 8–9.  Individuals at Treasury communicated with members of the Tax Reform

Working Group about "legislative and administrative options for tax reform, communications

strategy related to tax reform, and proposed work plans and agendas identifying priorities and

informing future tasks and activities of the [Tax Reform] Working Group."  Kowalski Decl. ¶ 10.

This process "culminated in the release of" "a comprehensive tax reform proposal [by the 'Big

---

(. . . continued)

Declaration of Andrew B. Stein ("Stein Decl."); (5) the Defendant's Statement of Material Facts Not in Dispute ("Def.'s Facts"); (6) the Memorandum of Points and Authorities in Support of Plaintiff's Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem."); (7) the Declaration of Elizabeth France in Support of Plaintiff's Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("France Decl."); (8) the Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue in Support of Its Cross-Motion for Summary Judgment ("Pl.'s Facts"); (9) the Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Reply Supporting Defendant's Motion for Summary Judgment ("Def.'s Opp'n"); (10) the Defendant's Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue ("Def.'s Resp. to Pl.'s Facts"); (11) the Reply in Support of Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Reply"); (12) Treasury's Notice of Submission of Amended Vaughn Index ("Def.'s Not."); (13) Treasury's Amended <u>Vaughn</u> Index ("Def.'s Am. Vaughn Index" or the "<u>Vaughn</u> index"); and (14) the plaintiff's Notice ("Pl.'s Not.").

Six',]" on September 27, 2017, "entitled the 'Unified Framework for Fixing Our Broken Tax Code' [(the "Unified Framework")]."  Id.

After the Unified Framework was released, Treasury contends that "communications between the Tax Reform Working Group and discrete communications between Treasury and Congress shifted towards the technical aspects of draft legislation, such as the details of legislative options and language[,]" and Treasury "adjusted and refined its positions on specific legislative proposals, as well as its decision[]making regarding Congressional outreach and potential administrative initiatives."  Id. ¶ 12.  Finally, as Congress approached a vote on the Tax Cuts and Jobs Act, which was signed into law by President Trump on December 22, 2017, Treasury represents that it "began to spend more time discussing the legislation and its potential impact with Members of Congress and their staff, in an effort to inform these individuals about Treasury's policy priorities and shape the legislation in a manner that aligned with the goals of the Secretary and the Administration."  Id. ¶ 13.  Treasury asserts that its "engagement with Congress also helped inform future administrative actions needed to implement tax reform legislation, including substantial rulemaking activities stemming from the [Tax Cuts and Jobs Act][,]" and "helped inform the manner in which [Treasury] officials briefed the Secretary regarding legislative developments[,]" such that the Secretary could then "inform[] and advise[] other stakeholders, including the President and other [White House] officials."  Id. ¶ 16.

The plaintiff is "a nonpartisan non-profit . . . organization committed to the promotion of transparency in government[.]"  Compl. ¶ 6.  On August 7, 2017, the plaintiff submitted its FOIA request to Treasury and the Office of Management and Budget ("OMB"), see Def.'s Facts ¶ 1; Pl.'s Facts ¶ 1, seeking "[a]ll communications, calendar invitations/entries, meeting notices, meeting agendas, informational material, draft legislation, talking points, or other materials

relating to potential legislation regarding the federal tax code exchanged between or including any members of Congress or congressional staff and [enumerated Treasury officials and anyone acting on behalf of any of these individuals (such as administrative assistants),]" Def.'s Facts ¶ 2; Pl.'s Facts ¶ 2, "from January 20, 2017, to the date that the search was conducted," Pl.'s Facts ¶ 3; see Def.'s Facts ¶ 3.

On October 5, 2017, the plaintiff filed this suit against Treasury and the OMB.  See Compl. at 1.  The Committee then moved to intervene as a defendant to assert the affirmative defense that its documents are congressional records beyond the scope of the FOIA, see Motion for Leave to Intervene of the Committee on Ways and Means of the U.S. House of Representatives, and the Court granted the Committee's motion, see Min. Order (June 22, 2018), but "[the plaintiff] elected not to challenge [the] withholding of records that both [the] . . . [Committee] and Treasury contended belonged to Congress[,]" Pl.'s Mem. at 2, n.1.

The OMB completed its production on February 15, 2019.  See id. at 2.  The plaintiff "elected not to challenge [the OMB's] search or withholdings," and on April 4, 2019, the OMB was dismissed from this case.  Id. at 2; see Joint Stipulation of Voluntary Dismissal of Defendant Office of Management and Budget at 1.

Treasury started making rolling productions of responsive documents to the plaintiff in January 2018.  See Joint Status Report (Dec. 14, 2017).   By June 2019, Treasury completed its productions, with the exception of "sixteen documents that contain legends asserting control by either the [ ] Committee . . . or the Joint Committee on Taxation[,]" which Treasury withheld as agency records not subject to disclosure, pursuant to the Court's December 18, 2018 Order.[2]

---

[2] Of these sixteen legended documents, "Treasury has determined that eight documents and their attachments are congressional records not subject to the FOIA, and [that] eight documents and their attachments are agency records subject to [the] FOIA."  Def.'s Mem. at 5; see Pl.'s Mem. at 2 n.1.  Because "[the] [p]laintiff is not challenging the
(continued . . .)

Joint Status Report at 1–2 (Mar. 15, 2019); <u>see</u> Order at 7 (Dec. 18, 2018), ECF No. 31.

Treasury thereafter filed its motion for summary judgment, asserting that it had properly

withheld material from its productions pursuant to FOIA Exemption 5, <u>see</u> Def.'s Mot. at 1, and

the plaintiff filed a cross-motion for summary judgment, asserting that Treasury's withholdings

pursuant to FOIA Exemption 5 were improper, <u>see</u> Pl.'s Mot. at 1.  These motions are the

subjects of this Memorandum Opinion.

## II.    STANDARD OF REVIEW

The Court must grant a motion for summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the Court must

view the evidence in the light most favorable to the non-moving party.  <u>See</u> <u>Holcomb v. Powell</u>,

433 F.3d 889, 895 (D.C. Cir. 2006) (citing <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133,

150 (2000)).  The Court must therefore draw "all justifiable inferences" in the non-moving

party's favor and accept the non-moving party's evidence as true.  <u>Anderson v. Liberty Lobby</u>,

477 U.S. 242, 255 (1986).  The non-moving party, however, cannot rely on "mere allegations or

denials," <u>Burke v. Gould</u>, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at

248), but must instead present specific facts "such that a reasonable [factfinder] could return a

verdict for the non[-]moving party," <u>Grosdidier v. Broad. Bd. of Governors, Chairman</u>, 709 F.3d

19, 23 (D.C. Cir. 2013) (quoting <u>Anderson</u>, 477 U.S. at 248).  Thus, "[c]onclusory allegations

unsupported by factual data will not create a triable issue of fact."  <u>Pub. Citizen Health Research</u>

---

(. . . continued)

eight legended records which Treasury determined are congressional records[,]" "there is no dispute between
Treasury and [the] [p]laintiff as to those documents, [and] they are not further addressed in [the parties'] motion[s]."
Def.'s Mem. at 5; <u>see</u> Pl.'s Mem. at 2, n.1.  However, the plaintiff does "challenge any Exemption 5 withholdings
from the eight legended records which Treasury determined are agency records, even though Treasury has not yet
produced those records to [the] [p]laintiff[,]" and the parties therefore "address[] those withholdings in [their]
motion[s], for completeness sake."  Def.'s Mem. at 5–6; <u>see</u> Pl.'s Mem. at 2, n.1.

Grp. v. Food & Drug Admin., 185 F.3d 898, 908 (D.C. Cir. 1999) (Garland, J., concurring) (alteration in original) (quoting Exxon Corp. v. Fed. Trade Comm'n, 663 F.2d 120, 126–27 (D.C. Cir. 1980)).  If the Court concludes that "the non[-]moving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Thus, when "ruling on cross-motions for summary judgment, the [C]ourt shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed."  Shays v. Fed. Electoral Comm'n, 424 F. Supp. 2d 100, 109 (D.D.C. 2006).

"FOIA cases are typically resolved on motions for summary judgment."  Ortiz v. U.S. Dep't of Justice, 67 F. Supp. 3d 109, 116 (D.D.C. 2014); see also Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  The "FOIA requires federal agencies to disclose, upon request, broad classes of agency records unless the records are covered by the statute's exemptions."  Students Against Genocide v. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001); see also Wash. Post Co. v. U.S. Dep't of Justice, 863 F.2d 96, 101 (D.C. Cir. 1988) ("[The] FOIA is to be interpreted with a presumption favoring disclosure and exemptions are to be construed narrowly.").  In a FOIA action, the agency has "th[e] burden of demonstrating that the withheld documents are exempt from disclosure," Boyd v. U.S. Dep't of Justice, 475 F.3d 381, 385 (D.C. Cir. 2007), and this burden "cannot be met by mere conclusory statements," Wash. Post Co., 863 F.2d at 101.  "The agency may meet this burden by filing affidavits describing the material withheld and the manner in which it falls within the exemption claimed," King v. U.S. Dep't of Justice, 830 F.2d 210, 217 (D.C. Cir. 1987), and by "show[ing] how

release of the particular material would have the adverse consequence that the Act seeks to guard against," Wash. Post Co., 863 F.2d at 101.

Courts will grant summary judgment to the agency in a FOIA case only if the agency can prove "that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." Friends of Blackwater v. Dep't of Interior, 391 F. Supp. 2d 115, 119 (D.D.C. 2005) (quoting Greenberg v. U.S. Dep't of Treasury, 10 F. Supp. 2d 3, 11 (D.D.C. 1998)).  Thus, in a lawsuit brought to compel the production of documents under the FOIA, "an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly[, or partially,] exempt [from disclosure].'" Students Against Genocide, 257 F.3d at 833 (first alteration in original) (quoting Goland v. Cent. Intelligence Agency, 607 F.2d 339, 352 (D.C. Cir. 1978)).  However, "[t]he burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" Pub. Citizen Health Research Grp., 185 F.3d at 904–05 (quoting Nat'l Ass'n of Gov't Emps. v. Campbell, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

### III.    ANALYSIS

The plaintiff challenges Treasury's withholding of information under the deliberative process privilege of Exemption 5.  See Pl.'s Mem. at 1.  The Court will first address whether Treasury properly withheld documents pursuant to Exemption 5 and will then address whether Treasury reasonably segregated the withheld information.

A.      **Whether Treasury Properly Withheld Documents Pursuant to Exemption 5**

The plaintiff argues that (1) the information withheld by Treasury falls outside the scope

of Exemption 5 because the withheld communications do not constitute "inter-agency" or

"intra-agency" communications, see Pl.'s Mem. at 4, and (2) the withheld information is not

protected by the deliberative process privilege, see id. at 26.  Treasury disputes both of these

conclusions, asserting that it has properly withheld the information under Exemption 5's

deliberative process privilege because the withheld information qualifies as "inter-agency" or

"intra-agency" communications in aid of Treasury's deliberative process.  See Def.'s Mem. at

10, 20.  The Court will address the parties' arguments in turn.

1.   **Whether the Withheld Information Qualifies as "Inter-Agency" or "Intra-Agency" Communications**

The plaintiff first asserts that Treasury has failed to satisfy the threshold requirement of

Exemption 5: that the withheld material constitute "inter-agency" or "intra-agency"

communications.  See Pl.'s Mem. at 5.  Specifically, the plaintiff argues that "[t]he plain text of

Exemption 5 applies only to 'inter-agency or intra-agency' records[,]" id. (citing 5 U.S.C.

§ 552(b)(5)), and that the FOIA "explicitly excludes Congress from its definition of the term

'agency[,]'" id. (citing 5 U.S.C. § 552(1)(A)).  Treasury contends, however, that its

communications with Congress were properly withheld under Exemption 5 because these

communications were made "in aid of the agency's deliberative process[,]" Def.'s Mem. at 1,

and therefore qualify as "intra-agency" records under a doctrine known as the "consultant

corollary[,]" id. at 10–11.

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would

not be available by law to a party other than an agency in litigation with the agency[.]"  5 U.S.C.

§ 552(b)(5).  To be covered by Exemption 5, a document's "source must be a [g]overnment

agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  Dep't of Interior & Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001).  "[T]he parameters of Exemption 5 are determined by reference to the protections available to litigants in civil discovery; if material is not 'available' in discovery, it may be withheld from FOIA requesters."  Burka v. Dep't of Health & Human Servs., 87 F.3d 508, 516 (D.C. Cir. 1996).  Thus, Exemption 5 covers "'those documents, and only those documents, normally privileged in the civil discovery context,' those privileges being: (1) the deliberative process privilege '(sometimes referred to as 'executive privilege')'; (2) the attorney-client privilege; and (3) the attorney work-product privilege."  Citizens for Responsibility & Ethics in Washington v. Nat'l Archives & Records Admin., 715 F. Supp. 2d 134, 138 (D.D.C. 2010) (Walton, J.) (quoting Nat'l Lab. Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 148–49 (1975)).

While Congress does not constitute an "agency" as defined under the FOIA, see Dow Jones & Co. v. Dep't of Justice, 917 F.2d 571, 574 (D.C. Cir. 1990) (citing 5 U.S.C. §§ 551(1), 552(f)), "communications between an agency and Congress [sh]ould receive protection as intra-agency memoranda if they were 'part and parcel of the agency's deliberative process,'" Rockwell Int'l Corp. v. U.S. Dep't of Justice, 235 F.3d 598, 604 (D.C. Cir. 2001) (quoting Dow Jones, 917 F.2d at 575).  The District of Columbia Circuit has therefore held that communications between an agency and non-agency consultants may qualify as "intra-agency" communications under the doctrine known as the "consultant corollary."  Under the consultant corollary doctrine,

> records exchanged between an agency and outside consultants qualify as "intra-agency" for purposes of Exemption 5 if (1) the agency solicited the records from the non-agency party or there exists "some indicia of a consultant relationship between the outsider and the agency," and (2) the records were

"created for the purpose of aiding the agency's deliberative process." Judicial Watch, Inc. v. U.S. Dep't of State, 306 F. Supp. 3d 97, 106–07 (D.D.C. 2018) (citation omitted) (first quoting Nat'l Inst. of Military Justice v. U.S. Dep't of Def., 512 F.3d 677, 686–87 (D.C. Cir. 2008); then quoting Pub. Citizen, Inc. v. Dep't of Justice, 111 F.3d 168, 170 (D.C. Cir. 1997)).  The Court will address these two conditions of the consultant corollary doctrine in turn.

a.   **Agency Solicitation or Indicia of a Consultant Relationship**

First, the plaintiff asserts that Treasury has failed to satisfy the first condition of the consultant corollary doctrine because "Treasury has not shown that it initiated a consultancy relationship with Congress (or any Congressional committee, member, or staff)[.]"  Pl.'s Mem. at 8 (capitalization removed).  Treasury, on the other hand, contends that its "consultations with Congress fit squarely within the consultant corollary line of cases" because "Treasury communicated with members of Congress, their staff, and committee staff to obtain relevant views and information relating to proposals to enact the President's goal of tax reform, including strategies, policy proposals, and work plans and agendas."  Def.'s Mem. at 13.

The first condition of the consultant corollary doctrine requires that "the agency solicited the records from the non-agency party or there exists some indicia of a consultant relationship between the outsider and the agency[.]"  Judicial Watch, Inc. v. U.S. Dep't of State, 306 F. Supp. 3d at 106–07 (citation and internal quotation marks omitted).  See Nat'l Inst. of Military Justice, 512 F.3d at 678, 680–81 (holding that "records containing the opinions and recommendations of non-governmental lawyers" who were advising the Department of Defense about terrorist trial commissions were protected from disclosure under Exemption 5 because the documents were "submitted by non-agency parties in response to an agency's request for advice"); Pub. Citizen, Inc. v. Dep't of Justice, 111 F.3d 168, 169, 171 (D.C. Cir. 1997) (holding that communications

between former Presidents and the National Archives and Records Administration concerning the maintenance of their presidential records were protected from disclosure under Exemption 5 because the former President[s] "clearly qualifie[d]" as outside experts "on the implications of disclosure of Presidential records[.]"); Ryan v. Dep't of Justice, 617 F.2d 781, 789–91 (D.C. Cir. 1980) (holding that senators' responses to a questionnaire from the Attorney General about "procedures for selecting and recommending potential [judicial] nominees" were "exempt from disclosure under Exemption 5" because the senators were serving as "temporary consultants," and the exposure of the communications "would inhibit frank discussion of policy matters and likely impair the quality of decisions" (citation omitted)).

Here, the declarations submitted by Treasury demonstrate the "indicia of a consultant relationship" between the agency, the Tax Reform Working Group, and other members of Congress and their staff. Nat'l Inst. of Military Justice, 512 F.3d at 686. Specifically, the declarations show that Treasury consulted with the Tax Reform Working Group and other members of Congress and their staff to benefit Treasury's decisionmaking processes regarding the development of tax reform legislation, and that Treasury relied on these communications like they would the analysis and recommendations of an outside consultant. See, e.g., Kowalski Decl. at 4, n.4 (noting that Treasury's Vaughn index includes "emails among Tax Reform Working Group members discussing legislative and administrative options for tax reform, communications strategy related to tax reform, and proposed work plans and agendas in the lead-up to the release of the Unified Framework"); id. ¶ 11 (noting that "[i]n several instances, Treasury officials initiated communications with [c]ongressional staffers seeking information about specific legislative proposals in order to support Treasury's role in facilitating tax reform legislation"); id. ¶ 14 (noting that Treasury "considered [c]ongressional feedback on the [Tax

Cuts and Jobs Act] during regular senior staff meetings devoted to tax reform and adjusted any further technical assistance accordingly" and "made decisions on Congressional outreach—and identified and prioritized potential implementation issues—based on the same information"). Accordingly, the Court concludes that Treasury has demonstrated that its communications with Congressional actors were "part and parcel of the agency's deliberative process[,]" such that these communications are entitled to confidentiality as "intra-agency documents[,]" Dow Jones, 917 F.2d 571 at 575, and that the first condition of the consultant corollary doctrine is therefore satisfied, see Judicial Watch, Inc. v. U.S. Dep't of Transp., 950 F. Supp. 2d 213, 214, 221 (D.D.C. 2013) (holding that the consultant corollary doctrine applied to communications exchanged between the Federal Railroad Administration and the California High Speed Rail Authority, where the agency and the non-agency "collaborat[ed]" with each other to "jointly develop environmental impact reports" for a proposed high speed rail plan).

The plaintiff's counterarguments on this point are unavailing.  First, the plaintiff argues that Treasury has failed to demonstrate an indicia of a consultancy relationship because it has not "provide[d] evidence that the withheld material was generated in response to [Treasury's solicitation of assistance and expert input from Congress" or "that Treasury manifested to Congress . . . an intent to engage Congress (or any member, committee, or staff thereof) as a consultant."  Pl.'s Mem. at 9.  However, the Circuit does not "mandat[e] agency solicitation for a communication to be 'intra-agency.'"  Judicial Watch, Inc. v. Dep't of Energy, 412 F.3d 125, 130–31 (D.C. Cir. 2005) (holding that documents "shared with or received from" a presidentially established entity that was not an agency could be withheld under Exemption 5, and noting that it was "of no moment" "[t]hat the President, rather than an agency" had "initiated the policy development process[,]" because "what matters is whether a document will expose the

pre[]decisional and deliberative processes of the Executive Branch"); Formaldehyde Inst. v.

Dep't of Health & Human Servs., 889 F.2d 1118, 1122 (D.C. Cir. 1989) (holding that comments

sent to the Department of Health and Human Services from a scientific journal's outside

reviewers were protected from disclosure under Exemption 5, even when "[t]he agency d[id] not

'solicit' the reviews in the sense that it contracts to receive them," but instead "actively s[ought]

to do business with journals from which reviews are both expected and then used by [the

agency]").  Here, while some of the withheld communications were not expressly solicited by

Treasury, this does not change the underlying fact that Treasury had established a consultant

relationship with the Tax Reform Working Group and other congressional actors in aid of its

deliberative process.  Treasury "affirmatively chose to participate in the Tax Reform Working

Group in order to achieve [its] objectives for tax reform[,]" Def.'s Opp'n at 7–8, and there was

an "expect[ation] that communications between Treasury and Congress would be kept

confidential . . . [to] enable[] candid and thoughtful discussion about policy options[,]" Kowalski

Decl. ¶ 18.  This arrangement reflects a "mutual understanding" between Treasury and Congress

regarding not only the role that their communications would play in the process of agency

deliberations, but also that these communications would be kept confidential, and "[t]he

existence of such an arrangement" suggests that the withheld materials were "a part of the

deliberative process of the agency."  Formaldehyde, 889 F.2d at 1124.

　　　　The plaintiff next argues that the first condition of the consultant corollary doctrine is not

satisfied because Treasury has failed to provide evidence that the congressional actors

"understood themselves to be acting as consultants to agency deliberations through some formal

or informal agreement."  Pl.'s Mem. at 9.  However, the plaintiff "cites no authority that

suggests, much less holds, that the subjective mindset of a non-agency is a requirement . . . when

applying the consultant corollary [doctrine][,]" Def.'s Opp'n at 9, and the Court is unable to independently locate any such authority.  Rather, the relevant inquiry is whether there exists "some indicia of a consultant relationship between the outsider and the agency[,]" Judicial Watch, Inc., 306 F. Supp. 3d at 106–07 (citation and internal quotation marks omitted), which exists here for the reasons outlined above.

Finally, the plaintiff argues that Treasury fails to establish the existence of a consultancy relationship with Congress because Treasury's involvement "frequently consisted of Congress soliciting Treasury's analysis, data, or other assistance for its own, congressional purposes[,]" Pl.'s Mem. at 10, rather than communications made "for the benefit of Treasury[,]" id. at 12. However, as Treasury correctly notes, the Circuit has recognized that "back-and-forth communications between the agency and an outsider can fall within the consultant corollary [doctrine], even when the outsider has interests and goals that differ from those of the agency." Def.'s Mem. at 11; see Pub. Citizen, 111 F.3d at 171 (holding that communications between former Presidents and the National Archives and Records Administration concerning the maintenance of their presidential records were protected from disclosure under the deliberative-process privilege under Exemption 5, even though the former Presidents had "independent presidential interests" in the disposition of their documents by the agency, and rejecting as a "false dichotom[y]" the plaintiff's argument that "[b]ecause there are other aspects to the relationship," the relationship "cannot be consultative for purposes of Exemption 5").  Here, while members of Congress may have received guidance from Treasury or even initiated contact with Treasury, "the consultative relationship is not mutually exclusive" with other features of the relationship, and there is no indication that these other features have "eclipse[d] the consultative relationship[.]"  Pub. Citizen, 111 F.3d at 171.  Accordingly, because there exists the indicia of a

consultant relationship between Treasury, the Tax Reform Working Group, and other members of Congress, the Court finds that the first condition of the consultant corollary doctrine is satisfied.

### b. Purpose of Aiding the Agency's Deliberative Process

Having found that the first condition of the consultant corollary doctrine is satisfied, the Court next considers whether the second condition of the doctrine, i.e., whether the withheld records were created for the purpose of aiding Treasury's deliberative process, is satisfied.  The plaintiff argues that "Congress did not provide neutral, expert advice characteristic of a consultant relationship[,]" Pl.'s Mem. at 13 (capitalization removed), because the relationship "was instead the ordinary engagement of two independent, co-equal branches engaged in back-and-forth negotiations regarding congressional legislative efforts[,]" id. at 17.  Treasury, however, asserts that "the congressional members of the Tax Reform Working Group and the other Republican members of Congress and their staff were not self-advocates seeking a particular government benefit from Treasury at the expense of others[,]" but rather, they were pursuing a shared "goal of working on tax reform" and "deliver[ing] an improved, pro-growth, fiscally responsible tax system to the American public[.]"  Def.'s Mem. at 18 (citation omitted).

The Supreme Court has held that, in assessing a consultant's purpose in aiding an agency's deliberative process, "the dispositive point" is that the consultant cannot advocate a course of action "that is necessarily adverse to the interests of competitors."  Klamath, 532 U.S. at 14; see id. at 4–6, 12 (holding that documents exchanged between American Indian tribes and the Department of the Interior were not protected by Exemption 5 because the tribes had been acting as "self-advocates at the expense of others," and "s[ought] benefits [in the form of the distribution of water rights] inadequate to satisfy everyone").  The Circuit, as another member of

15

this Court observed, "has recognized that, under some circumstances, a consultant and an agency

may share common goals such that, even if the consultant appears to be acting to foster its own

interests, its actions might also be construed as aiding an agency process."  Judicial Watch, Inc.,

306 F. Supp. 3d 97 at 112 (citing Formaldehyde Inst., 889 F.2d at 1124–25); see Pub. Citizen,

111 F.3d at 171 (holding that communications between former Presidents and the National

Archives and Records Administration concerning the maintenance of their presidential records

were protected from disclosure under the deliberative process privilege of Exemption 5, even

though "a former President's power to assert his rights and privileges" in consultations about his

presidential records "constitutes an independent interest[,]" because "the potential for an

adversary relationship is not enough to negate one of consultation"); Ryan, 617 F.2d at 784

(holding that senators' responses to a questionnaire from the Attorney General about judicial

nominations were exempt from disclosure, even though the senators likely had their own views

and interests with respect to "their procedures for selecting and recommending potential

[judicial] nominees").[3]

Here, the members of Congress who interacted with Treasury on the Trump tax reform

initiative and their staff "were not self-advocates seeking a particular government benefit at the

expense of others[,]" but rather, they were "working together" with Treasury "on the common

project of enacting tax reform consistent with the Trump Administration's priorities[.]"  Def.'s

Opp'n at 16–17.  According to one of Treasury's declarants, when Treasury consulted with the

---

[3] The Court notes that the Circuit's holdings in Public Citizen and Ryan arguably set forth a more expansive view of the scope of the Exemption 5 privilege than that recognized in Klamath because the outside consultants in those cases were advocating positions which would likely benefit themselves.  See Klamath, 532 U.S. at 12 (noting that the Public Citizen and Ryan decisions "arguably extend" beyond the "typical examples" of cases in which communications of outside consultants have been held to satisfy "inter-agency or intra-agency" threshold).  Nevertheless, the Supreme Court in Klamath expressly declined to overrule the Public Citizen and Ryan decisions, and they remain good law in this Circuit and therefore are binding on this Court.  See id. at 12 n. 4 (citing Pub. Citizen, 111 F.3d at 168; Ryan, 617 F.2d at 781).

Tax Reform Working Group, the "members of the Tax Reform Working Group [ ] share[d] the common interest and goal of advancing tax reform legislation consistent with the principles ultimately laid out in the Uniform Framework[,]" and "Treasury's communications with members of the Tax Reform Group . . . [were] towards a common goal, rather than an attempt of congressional individuals to gain a benefit from Treasury." Kowalski Decl. ¶ 17.  Additionally, Treasury's declarant represents that when Treasury consulted with other Republican members of Congress, beyond those in Tax Reform Working Group, regarding tax reform initiatives, "their interests and ultimate goals [were] aligned with Treasury's: advancing pro-growth tax reform legislation." Id.  Under these circumstances, the interests of the members of Congress who interacted with Treasury on the Trump tax reform initiative are "sufficiently aligned with the federal agency's interests so as to be included in the consultant corollary [doctrine][.]" Judicial Watch, Inc., 950 F. Supp. 2d at 219 n.5; see id. at 219–20 (noting that although the state rail authority "arguably had interests that were distinct from [the agency's] interests, the benefits it sought on [its own] behalf . . . are too remote from its communications with [the agency] and from the decision [the agency] was making").

The plaintiff's opposing arguments do not persuade the Court otherwise.  The plaintiff first argues that "the congressional participants advanced their own interests and agendas[,]" Pl.'s Mem. at 15, and that this self-interest removes this case from the proper confines of Exemption 5, see id. at 16, and that even if the congressional actors shared the same general goal of "pro-growth" tax reform, there are "[d]ifferent alternatives" for achieving that reform that "will appeal to different actors" based on considerations such as "an individual member's ideological perspective" and "the likely effects on a congressperson's re-election or future career[.]" Id. at 16.  However, the type of "self-interest" that the plaintiff attributes to the

congressional actors here differs from the disqualifying self-interest at issue in <u>Klamath</u>.   In

<u>Klamath</u>, "the tribe's communications directly advocated for the benefits it sought from the

project and the government's decision directly concerned whether to dispense those benefits[,]"

<u>Judicial Watch, Inc.</u>, 950 F. Supp. 2d at 220 (citing <u>Klamath</u>, 532 U.S. at 11–14), whereas in this

case, the Tax Reform Working Group and the other participating members of Congress were

"attempting to bring together different views to legislate in the public interest[,]" Def.'s Opp'n

at 16.  Although these congressional individuals "may have also had their own interests that

differed somewhat from Treasury's" regarding "their own opinions and views about the precise

type of pro-growth tax reform that should be undertaken," Treasury's declarations and <u>Vaughn</u>

index demonstrate that these individuals "were not seeking a limited benefit from Treasury to the

exclusion of others."  <u>Id.</u> at 16–17.  Accordingly, the Court concludes that the members of

Congress who interacted with Treasury on the Trump tax reform initiative do not constitute

"interested parties seeking a government benefit" with interests that are "adverse to others

seeking that benefit."  <u>Judicial Watch</u>, 950 F. Supp. 2d at 218; <u>see</u> Report and Recommendation,

<u>Am. Oversight, Inc. v. U.S. Dep't of Health & Human Servs.</u>, No. CV 17-827 EGS/DAR, 2018

WL 4765145, at *7 (D.D.C. Aug. 10, 2018) ("Congress did not provide this advice in its own

personal interest or in the interests of a private client, but in the interest of the American people,

and was exercising its independent judgment in doing so.  Thus, the Congress members were not

providing advice in their own self-interest.").

        The plaintiff next argues that "outside consultants [must] lack an independent interest"

for the consultant corollary doctrine to apply.  <u>See</u> Pl.'s Mem. at 13 (internal quotation marks

omitted) (quoting <u>Am. Oversight v. U.S. Dep't of Health & Human Servs.</u>, 380 F. Supp. 3d 45,

54 (D.D.C. 2019).  However, the plaintiff's reliance on the earlier <u>American Oversight</u> case is

misplaced.  As a preliminary matter, as the Court has already explained, the Circuit "has

recognized that, under some circumstances, a consultant and an agency may share common goals

such that, even if the consultant appears to be acting to foster its own interests, its actions might

also be construed as aiding an agency process." Judicial Watch, Inc., 306 F. Supp. 3d at 111

(citing Formaldehyde Inst., 889 F.2d at 1124–25).  Although the earlier American Oversight

court observed that "since Klamath, the [ ] Circuit has consistently reiterated the principle that

the outside consultant must be a neutral party who is not representing its own interests" and that

"it appears that the law in this Circuit does require that outside consultants 'lack an independent

interest[,]'" 380 F. Supp. 3d at 54 (citation and internal quotation marks omitted), the court

ultimately "put[] aside the narrow legal question of whether the mere existence of some

independent interest in the topic on the part of the outsider is disqualifying" and instead found

that "the record does not support a finding that the communications with Congress 'played

essentially the same part in an agency's process of deliberation as documents prepared by agency

personnel[,]'" id. at 55.  Therefore, the Court finds the plaintiff's arguments on this point

unpersuasive, especially in light of prior authority in this Circuit when outside consultants did

not lack an independent interest, but Exemption 5 was nonetheless deemed applicable.  See Pub.

Citizen, 111 F.3d at 171; Ryan, 617 F.2d at 784.

    And, even if the Court found the earlier American Oversight case persuasive, it is

distinguishable from this case.  In that case, the court held that the withheld information was not

eligible for protection under Exemption 5 because the agency had failed to address Congress's

self-interest.  See Am. Oversight, 380 F. Supp. 3d at 54 n.5 (noting that "[the] defendants have

failed to meet their burden because their declarations do not address the question of the

[c]ongressional offices' self-interest at all").  Here, however, Treasury has submitted declarations

which sufficiently address the question of the self-interest of the Congressional representatives and their staff who interacted with Treasury.  See Kowalski Decl. ¶ 17.  Although the plaintiff dismisses Treasury's "self-serving assertions about congressional interests . . . in the Kowalski declaration," Pl.'s Mem. at 15, the plaintiff fails to point to any "contradictory evidence in the record" or "evidence of agency bad faith" that discredits the agency's representations.  Halperin v. Cent. Intelligence Agency, 629 F.2d 144, 148 (D.C. Cir. 1980) ("[S]ummary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail . . . , and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.").

Accordingly, the Court concludes that the withheld records were "created for the purpose of aiding the agency's deliberative process[,]" Judicial Watch, Inc., 306 F. Supp. 3d at 106–07 (citation and internal quotation marks omitted), and that Treasury has demonstrated that these records satisfy the second condition of the consultant corollary doctrine.

### 2.   Whether the Withheld Information is Predecisional and Deliberative

Having determined that the withheld information qualifies as "intra-agency" communications under Exemption 5 because they satisfy both conditions of the consultant corollary doctrine, the Court next addresses the second step of the Exemption 5 analysis, i.e., whether the information was properly withheld pursuant to the deliberative process privilege. See Klamath, 532 U.S. at 8.  The plaintiff contends that "Treasury has also failed to meet [its] burden of establishing that the communications at issue meet the requirements for any applicable privilege against discovery in civil litigation."  Pl.'s Mem. at 26.  Treasury, however, asserts "[t]he redacted material[s] meet[] both criteria for being withheld pursuant to Exemption 5, as [they are] both pre[]decisional and deliberative[,]" Def.'s Mem. at 20, and that "Treasury has

explained through its declarations the internal, [ ] deliberative processes to which the withheld materials relate[,]" Def.'s Opp'n at 1 (emphasis removed).

"To justify its application of the deliberative process privilege, an agency must address the following areas: '(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient.'" Hunton & Williams LLP v. U.S. Envtl. Prot. Agency, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) (quoting Nat'l Sec. Counselors v. Cent. Intelligence Agency, 960 F. Supp. 2d 101, 189 (D.D.C. 2013)); see Senate of P.R. v. U.S. Dep't of Justice, 823 F.2d 574, 585–86 (D.C. Cir. 1987) ("The agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" (quoting Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 868 (D.C. Cir. 1980)); see also Arthur Andersen & Co. v. Internal Revenue Serv., 679 F.2d 254, 258 (D.C. Cir. 1982). "To be exempt from disclosure under the deliberative process privilege, the agency must show that the information is both (1) 'predecisional' and (2) 'deliberative.'" Cleveland v. U.S. Dep't of State, 128 F. Supp. 3d 284, 298 (D.D.C. 2015) (Walton, J.) (quoting Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 39 (D.C. Cir. 2002)).

"A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." Petrol. Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975)); see also Senate of P.R., 823 F.2d at 585 ("A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates."). "And a document is deliberative if it is 'a part of the agency give-and-take—of the deliberative process—by which the decision itself is made." Abtew v.

21

U.S. Dep't of Homeland Sec., 808 F.3d 895, 899 (D.C. Cir. 2015) (quoting Vaughn v. Rosen,
523 F.2d 1136, 1144 (D.C. Cir. 1975)); see also Pub. Emps. for Envtl. Responsibility v. U.S.
Envtl. Prot. Agency, 213 F. Supp. 3d 1, 11 (D.D.C. 2016) ("The 'key question' in determining
whether the material is deliberative in nature 'is whether disclosure of the information would
discourage candid discussion within the agency.'" (quoting Access Reports v. U.S. Dep't of
Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991))).

        The Court first addresses whether the withheld documents are predecisional.  Here, "[t]he
withheld material all pre[]dates the enactment of the Tax Cuts and Jobs Act" on December 22,
2017.  Def.'s Mem. at 20; see Stein Decl. ¶ 12 (noting that the withheld documents are from "the
period of February [to] November 2017").  Therefore, when "Treasury officials rel[ied] on
congressional individuals for information and opinions concerning proposed legislation[,]"
"[t]hat input preceded [ ] [Treasury's] decisions . . . about whether and how Treasury would
encourage the prospective legislation."  Def.'s Opp'n and Reply at 23.  Accordingly, the Court
concludes that the withheld material satisfies the predecisional prong of the deliberative process
privilege.

        The Court next addresses whether the documents qualify as deliberative.  The
declarations and Vaughn index submitted by Treausry demonstrate that it relied upon the
withheld material in its "decisionmaking processes linked to the process of developing tax
reform legislation[.]"  Def.'s Mem. at 20.  Specifically, Treasury describes three decisionmaking
processes that were served by its engagement with the Tax Reform Working Group and other
congressional individuals: (1) "Treasury's role in shaping and advising on proposed legislation in
order to advance Treasury's and the administration's policy priorities, including by providing
technical assistance on specific non-final legislative proposals[,]" Def.'s Opp'n at 20 (citing

Kowalski Decl. ¶¶ 10, 11, 14, 16); (2) "Treasury's ongoing deliberative process for evaluating the potential rulemakings and operational changes that would be necessary if a bill passed[,]" id. (citing Kowalski Decl. ¶ 12); and (3) "Treasury's process in developing briefings for the Secretary and outreach for external stakeholders and the media[,]" id. (citing Kowalski Decl. ¶¶ 16, 20).  The Vaughn index provided by Treasury also "ties each specific instance of withheld material to Treasury's decisionmaking process to which it relates" and explains in detail why each redaction falls within the deliberative process privilege.  Id.; see, e.g., Treasury's Am. Vaughn Index at 15 (noting that Treasury redacted portions of an "[e]mail exchange between Tax Reform Working Group officials from the House, Treasury, Senate, and [the Executive Office of the President]" that "propose next steps and make[] recommendations on specific initiatives under consideration by the Tax Reform Working Group[,]" and that "the withheld material is pre-decisional and deliberative with respect to Treasury's decision of which tax reform legislative and policy options to pursue in its engagement with the Tax Reform Working Group"); see, e.g., Treasury's Am. Vaughn Index at 117 (noting that Treasury redacted a "[d]raft document . . . summarizing the proposed 'United Framework' for tax reform among the House, Senate, and the Trump Administration" and that "the withheld material is pre-decisional and deliberative with respect to Treasury's decision of which tax reform policy options to pursue in its engagement with the Tax Reform Working Group and Republican members of Congress and their staff, and the manner in which it engages with the [Tax Reform Working Group]").  These descriptions demonstrate that the withheld information "reflects the give-and-take of the consultative process."  Coastal States, 617 F.2d at 866 (explaining that the deliberative process privilege covers "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of

the agency").  The Vaughn index and the declarations submitted by Treasury provide sufficient

information of a definable decisionmaking process for the Court to "pinpoint [the] agency['s]

decision or policy to which the document[s] contributed."  Senate of P.R., 823 F.2d at 585.

Moreover, the disclosure of the information at issue "would discourage candid discussion

within the agency" and therefore undermine the purpose underlying the deliberative process

privilege.  Pub. Emps. for Envtl. Responsibility, 213 F. Supp. 3d at 11; see Kowalski Decl. ¶¶

21–22 (stating that "absent an expectation of confidentiality, Treasury would not have been able

to effectively deliberate about the [Tax Cut and Jobs Act] internally or engage with Congress or

external stakeholders[,]" and that "[i]f such communications were always subject to release

under the FOIA, then the FOIA would deter candid and thoughtful discussions between Treasury

and Congress on matters of significant importance to the public, and the integrity of Treasury's

decision[]making process would suffer"); see also Sierra Club v. U.S. Dep't of Interior, 384 F.

Supp. 2d 1, 16 (D.D.C. 2004) ("The privilege protects the 'deliberative process' because it is the

very process of debating, shaping, and changing a proposed major policy that needs candor,

vigorous to-and-fro, and freedom of expression.").  Therefore, disclosing the withheld material

would implicate the very concerns that the deliberative process privilege seeks to protect.  See

United States v. Nixon, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who

expect public dissemination of their remarks may well temper candor with a concern for

appearances and for their own interests to the detriment of the decisionmaking process.").

Accordingly, the Court concludes that the withheld material satisfies the deliberative factor of

the deliberative process privilege.

The plaintiff's arguments to the contrary are unpersuasive to the Court.  The plaintiff

asserts that the communications at issue "precede and inform legislative, not administrative,

actions[,]" and only had "tenuous downstream effects on possible later Treasury actions."  Pl.'s

Mem. at 26–27.  However, Treasury's declarations "contain reasonable specificity of detail"

regarding the role that the communications played in its decisionmaking, and the plaintiff has

failed to "call[] into question" these declarations by presenting "contradictory evidence in the

record or [ ] evidence of agency bad faith."  Judicial Watch, Inc. v. U.S. Secret Serv., 726 F.3d

208, 215 (D.C. Cir. 2013).  As Treasury correctly notes, "collaborative communications between

an agency and Congress concerning potential legislation will frequently benefit both the

agency's work and Congress's[,]" Def.'s Opp'n at 22, see Murphy v. Dep't of Army, 613 F.2d

1151, 1156–58 (D.C. Cir. 1979) (protecting "executive-legislative communication[s]" that

revealed executive branch deliberations even when those communications served "official

congressional purposes[,]" and noting that if "every disclosure to Congress would be tantamount

to a waiver of all privileges and exemptions, executive agencies would inevitably become more

cautious in furnishing sensitive information to the legislative branch—a development at odds

with public policy which encourages broad congressional access to governmental information"),

and these communications may be used for more than one purpose, see Judicial Watch, Inc. v.

U.S. Dep't of Transp., 950 F. Supp. 2d at 219 (holding that communications exchanged between

an agency, the Federal Railroad Administration, and an outside consultant, the California High

Speed Rail Authority, were protected by the consultant corollary doctrine because they "aided

[the agency's] decisions as to which route alternatives best complied" with federal environmental

standards, even though the consultant also had interests in ensuring its compliance with

regulations).  The fact that the congressional actors might also have benefitted from these

communications does not negate the fact that the communications were also deliberative as to

Treasury's decisionmaking process.  See Formaldehyde, 889 F.2d at 1120 (holding that

comments sent to the Department of Health and Human Services from an epidemiology journal's outside reviewers were protected from disclosure under Exemption 5, where the journal also reviewed the comments and separately "decided not to publish [the] report" "[i]n light of the reviews that were received").

The plaintiff also argues that several documents in Treasury's <u>Vaughn</u> index "not related to any agency decision" and where Treasury fails to "describe[e] the role any of these records played in any deliberation" were improperly withheld.  Pl.'s Mem. at 28 (noting, for example, "[t]alking points provided by Senate [ ] staff to members of [the Tax Reform] [W]orking [G]roup 'in advance of a [Republican] Senate Finance Committee meeting'" and "[d]iscussion of [the Tax Reform] [W]orking [G]roup's 'public affairs strategy'").  However, Treasury's <u>Vaughn</u> index entries for these documents support Treasury's assertion that these "documents relate to Treasury's then-ongoing process of deciding what policy options to support in its engagement with the Tax Reform Working Group and how to do so."  Def.'s Opp'n at 21; <u>see</u> Def.'s Am. <u>Vaughn</u> Index (noting that the proposed talking points referenced "tax reform priorities and messaging for the [Tax Reform Working] Group's consideration" and that the discussion regarding public affairs strategy was made "in connection with proposed tax reform legislation").

The plaintiff further argues that Treasury's <u>Vaughn</u> index contains "boilerplate" descriptions and therefore provides an insufficient basis for withholding that information.  Pl.'s Mem. at 27–28 (identifying several documents that Treasury labeled as "pre[]decisional and deliberative with respect to Treasury's decision of which tax reform policy options to pursue in its engagement with the Tax Reform Working Group and Republican members of Congress and their staff, and the manner in which it engages with the [Tax Reform Working] Group").  However, there is no bar to using repetitive language to describe similar documents.  "On the

contrary, the C[ircuit] . . .  has made clear that, '[e]specially where the agency has disclosed and withheld a large number of documents, . . . repetition provide[s] [an] efficient vehicle[ ] by which a court can review withholdings that implicate the same exemption for similar reasons.'" Competitive Enter. Inst. v. U.S. Envtl. Prot. Agency, 12 F. Supp. 3d 100, 115 (D.D.C. 2014) (quoting Judicial Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 147 (D.C. Cir. 2006)); see also Judicial Watch, Inc., 449 F.3d at 147 ("No rule of law precludes [an agency] from treating common documents commonly.").

Finally, the plaintiff argues that "disclosure of the material at issue would not reveal Treasury's internal deliberations, because they reflect only the final decisions and actions that resulted from any genuine internal deliberations."  Pl.'s Mem. at 30; id. at 31 ("The records at issue in this case reflect only Treasury's implementation of those internal decisions: what positions Treasury actually took in inter-branch discussions[.]").  However, because the Tax Cut and Jobs Act had not yet passed at the time of the communications at issue, "Treasury's deliberations concerning how to engage with the process were still ongoing[,]" Def.'s Opp'n at 23, and it is therefore reasonable to expect that the communications at issue would still reflect Treasury's decisionmaking process.  As Treasury correctly notes, "[i]t is too facile to argue that, when an agency sends any communication, because the intermediate decision about what to write in that communication has been completed[,] the result is therefore not protected by Exemption 5."  Id. at 24; see Hooker v. U.S. Dep't of Health & Human Servs., 887 F. Supp. 2d 40, 56 (D.D.C. 2012), aff'd, No. 13-5280, 2014 WL 3014213 (D.C. Cir. May 13, 2014) ("Although agencies do not have to go as far as 'identify[ing] a specific decision corresponding to each communication' in order to demonstrate the predecisional and deliberative nature of withheld records, 'protection under Exemption 5 [requires at the least that] the document was

generated as part of a definable decision-making process.'" (alterations in original)).

Accordingly, the Court concludes that the withheld material constitutes both predecisional and

deliberative material, and therefore qualifies for protection under the deliberative process

privilege of Exemption 5.

**B.      Whether Treasury Reasonably Segregated the Withheld Information**

Having concluded that that the withheld material is entitled to protection under

Exemption 5, the Court must now address whether Treasury reasonably segregated the withheld

information.

The FOIA provides that, if a record contains information that is exempt from disclosure,

"[a]ny reasonably segregable portion of a record shall be provided to any person requesting such

record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "It has long been a

rule in this Circuit that non-exempt portions of a document must be disclosed unless they are

inextricably intertwined with exempt portions." Trans-Pacific Policing Agreement v. U.S.

Customs Serv., 177 F.3d 1022, 1027 (D.C. Cir. 1999). And, it is the agency's burden to show

with "reasonable specificity why the documents cannot be further segregated." Armstrong v.

Exec. Office of the President, 97 F.3d 575, 578 (D.C. Cir. 1996) (internal quotation marks

omitted). An agency must provide a detailed justification and not just conclusory statements to

prove that it has released all reasonably segregable information. See Judicial Watch, Inc. v. U.S.

Dep't of Justice, Civ. Action No. 01-639, 2006 WL 2038513, at *2 (D.D.C. July 19, 2006).

And, in a FOIA case, the Court has "an affirmative duty to consider the segregability issue sua

sponte." Trans-Pacific Policing Agreement, 177 F.3d at 1028. Additionally, the Court's

determination that agency records are exempt from disclosure under the FOIA is subject to

remand if the Court does not also make specific findings on the question of segregability.

See Krikorian v. U.S. Dep't of State, 984 F.2d 461, 467 (D.C. Cir. 1993) (remanding back to

district court because no specific findings of segregability were made); see also Powell v. U.S.

Bureau of Prisons, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991) (stating that it is error to "simply

approve the withholding of an entire document without entering a finding on segregability, or the

lack thereof").

In order to make the segregability determination, the Court must be provided with a

"relatively detailed description" of the withheld material.  Krikorian, 984 F.2d at 467

(citing Goldberg v. U.S. Dep't of State, 818 F.2d 71, 78 (D.C. Cir. 1987)).  Agencies must

review the withheld documents and determine whether, absent the exempted material, the

resulting document would still be comprehensible, or whether "the result would be an essentially

meaningless set of words and phrases."  Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566

F.2d 242, 261 (D.C. Cir. 1977).  A "document-by-document" review and a declaration that each

piece of information that is withheld is not reasonably segregable is sufficient to satisfy the

agency's burden.  See Juarez v. U.S. Dep't of Justice, 518 F.3d 54, 61 (D.C. Cir.

2008); Beltranena v. U.S. Dep't of State, 821 F. Supp. 2d 167, 178–79 (D.D.C. 2011).

Here, the Court is satisfied that Treasury has conducted a proper segregability

analysis.  Treasury represents that it has "reviewed each record at issue, line-by-line, to

identify information exempt from disclosure[,]" and that "[w]ith respect to the records at

issue that were released in part, all information not exempted from disclosure . . . was

correctly segregated and released."  Stein Decl. ¶ 17.  Additionally, "[w]ith respect to the

records at issue that were withheld in full," Treasury represents that it has "determined

that no segregation of meaningful information can be made without disclosing

information warranting protection under the law."  Id.  And, Treasury is "entitled to a

presumption that [it] complied with the obligation to disclose reasonably segregable material," Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1117 (D.C. Cir. 2007), unless the plaintiff can produce, at a minimum, evidence that "would warrant a belief by a reasonable person that the alleged [g]overnment impropriety might have occurred," Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 159 (2004); see also Sussman, 494 F.3d at 1117, which it has failed to do.  Therefore, based on the representations in one of the declarations submitted by Treasury, see Stein Decl. ¶¶ 16–18, the Court concludes that Treasury has adequately specified "which portions of the document[s] are disclosable and which are . . . exempt[,]" Vaughn, 484 F.2d at 827, and that it reasonably segregated the withheld information.

Accordingly, because the Court concludes that Treasury properly withheld information pursuant to Exemption 5 of the FOIA and reasonably segregated the withheld information, the Court will grant Treasury's motion for summary judgment and deny the plaintiff's cross-motion for summary judgment.

### IV.   CONCLUSION

For the foregoing reasons, the Court concludes that Treasury has properly withheld information pursuant to the deliberative process privilege under Exemption 5 and reasonably segregated the withheld information.   Accordingly, the Court grants Treasury's motion for summary judgment and denies the plaintiff's cross-motion for summary judgment.

**SO ORDERED** this 22nd day of July, 2020.[4]

REGGIE B. WALTON
United States District Judge

---

[4] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.